NUMBER 13-98-575-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


____________________________________________________________________


FRANCISCO ESQUIVEL CASTANEDA, JR.,

AKA MARIO CASTANEDA, Appellant,


v.



THE STATE OF TEXAS, Appellee.

____________________________________________________________________


On appeal from the 93rd District Court of Hidalgo County,

Texas.

____________________________________________________________________


O P I N I O N



Before Chief Justice Seerden and Justices Hinojosa and

Yañez

Opinion by Justice Hinojosa



 A jury found appellant, Francisco Esquivel Castaneda,(1) guilty of
two counts of aggravated robbery, one count of aggravated kidnaping
and one count of aggravated sexual assault and assessed his
punishment for each count at 99 years imprisonment and a fine of
$10,000. By five points of error, appellant contends: (1) the evidence
is factually insufficient to support his four convictions; (2) the trial court
erred by allowing a nurse to testify concerning a medical report
prepared by the victim's attending physician; (3) the trial court erred by
not including an instruction on the law of parties for all four counts of
the jury charge; (4) he was harmed by the unavailability of the State's
DNA expert's report, which the jury requested during its deliberations;
and (5) the trial court erred in proceeding with the punishment phase
of the trial with only eleven jurors. We reverse and remand for a new
trial on punishment only.

 By his first point of error, appellant contends the evidence is
factually insufficient to support his convictions. He argues that the DNA
evidence presented by the State did not conclusively establish the
semen found on the victim's clothing was his.

 When we review a factual sufficiency of the evidence point of
error, we review the evidence in support of and contrary to the trier of
fact's findings to determine whether the evidence is so weak that it
renders the verdict clearly wrong and manifestly unjust or the verdict
is contrary to the evidence. Johnson v. State, No. 1915-98, 2000 Tex.
Crim. App. LEXIS 12, at *21 (Feb. 9, 2000); see also Clewis v. State, 922
S.W.2d 126, 134 (Tex. Crim. App. 1996). We consider all the evidence
in the record related to the appellant's sufficiency challenge, comparing
the weight of the evidence that tends to prove guilt with the evidence
that tends to disprove it. Santellan v. State, 939 S.W.2d 155, 164 (Tex.
Crim. App. 1997). However, we are not free to reweigh the evidence
and set aside a jury verdict merely because we believe that a different
result is more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997); Clewis, 922 S.W.2d at 135. Only if the verdict is
against the great weight of the evidence presented at trial so as to be
clearly wrong and unjust, will we reverse the verdict and remand for a
new trial. Clewis, 922 S.W.2d at 133-34; Rosillo v. State, 953 S.W.2d
808, 813 (Tex. App.--Corpus Christi 1997, pet. ref'd).

 Because appellant has challenged the factual sufficiency of the
evidence, particularly his identification as the perpetrator of these
crimes, a very detailed examination of the evidence is necessary.

1. D. H.


 The female victim, D.H., testified that she and her estranged
boyfriend, R.V., were parked in R.V.'s Camaro. They talked and decided
to reconcile. They engaged in vaginal intercourse, and R.V. ejaculated. 
It is possible some of R.V.'s semen could have run down to D.H.'s anal
area and could have gotten on her jeans. When a light blue car, possibly
a Ford Tempo, pulled up nearby, they got scared and drove away. The
blue car followed, and D.H. heard gunshots. The blue car had one
headlight that was dimmer than the other. When the Camaro hit
something, it went into a ditch, and R.V. got out of the car with his
hands up. Three men got out of the blue car. A big man beat R.V. 
Then, D.H. heard another gunshot and thought R.V. was dead. 
Meanwhile, appellant was banging on the passenger door window with
a gun. He told D.H., in Spanish, to open the door or he would kill her. 
A third man was also beating on the car. When D.H. opened the door,
appellant took her purse and all her jewelry, then grabbed her by her
hair and arm and pulled her from the vehicle. He dragged her to the
blue car and forced her into the back seat. The other men got back in
the blue car, and they drove off with D.H. in the back seat.

 There were four men in the car: (1) appellant was in the front
passenger seat; (2) the heavy man who had beaten R.V. was in the
back seat, to D.H.'s left; (3) the other man who had gotten out of the
blue car was driving the car; and (4) another man was in the back seat,
to D.H.'s right. The fourth man was slim, light-complected, and had a
small child on his lap. The child looked about two years old. D.H.
thought it was a boy because it had short hair, but was not sure.

 The man with the child pushed her head down and told her, in
Spanish, to shut up and stay down. He also fondled her breasts. She
first spoke to the men in English, but they told her, in Spanish, to be
quiet and that they did not understand her. She begged for her life. 
She promised not to say anything if they let her go. She told them she
had a daughter. The child began crying. The slim man holding the
child told the child, in Spanish, not to look at D.H., and "Don't cry, my
son." D.H. got a good look at the child's face. She identified State's
Exhibit No. 93 as being a photograph of that child. Exhibit No. 93 is a
photograph of Cinthia Castaneda, appellant's daughter, who was two
years old on the day of the incident.

 The heavy man who beat R.V. sat on her left side, and he was
holding a gun to D.H.'s waist. D.H. told them she was a human being,
and asked them how they could do something like this. They laughed
at her and told her they had killed her boyfriend. When the car stopped,
the heavy man got out, and appellant pulled D.H. out of the car. The
heavy man got back in the car. Appellant held a gun to D.H.'s head and
forced her to the back of the car. She again begged him to let her go,
that she had a daughter. Appellant replied that he did too, so what? 
They walked down a road and went down a hill. She saw a large white
box nearby.

 Appellant forced her to disrobe, threw her to the ground and
sexually assaulted her vaginally, anally and then orally. D.H. could hear
the child crying in the car. The heavy man and the driver came down
the hill during the sexual assault. The driver began going through the
pockets of her jeans, saying in Spanish, "Let's see what drugs you have
here." The heavy man just watched. Appellant began to ejaculate in
D.H.'s mouth. She immediately pulled back and spit. Appellant cleaned
himself on D.H.'s jeans. He did not ejaculate in D.H.'s vagina or anus.

 The heavy man then began to orally sodomize D.H. She does not
remember him sexually assaulting her vaginally, but he may have. The
child began to cry very loudly, and D.H. heard police sirens. Somebody
said in Spanish, "Let's go," and the men left in the blue car.

 D.H. put one shoe on and grabbed her clothes. She left her
panties lying on the ground. She ran toward some lights, which she
eventually recognized as the Mission Hospital. She had to run through
cactus and across a canal and barbed wire. At some point, she stopped
and put on her clothes and the other shoe. She left her belt on the
ground. It began to rain, and she got mud on her shoes. There was no
mud in the area where she was assaulted. She continued toward
Mission Hospital, where she reported that R.V. had been killed and she
had been raped.

 D.H. gave a statement to sheriff's deputies later that day. Three
days after the incident, she was asked to attend a live lineup. The
deputy present at the lineup told her not to identify anyone unless she
was one hundred percent certain. She thought appellant was the one
who raped her, but she was not one hundred percent certain. At that
time, she "had everything blocked out [and] was still in shock." She
positively identified the light blue car on that day. On the way home
from the live lineup, she told R.V., who had survived the attack, that she
was positive appellant was the one. She later positively identified
appellant in a photo array (State's Exhibit No. 60). She also identified
the other three men in photo arrays (State's Exhibit Nos. 58, 59 and 61). 
She told Officer Ortega that she was one hundred percent positive that
appellant was the one who "had done everything. [He] was the main
one."

2. R. V.


 R.V. testified that he and D.H. were parked near Granjeno in his
black Z-28 Camaro. They had vaginal intercourse and R.V. ejaculated. 
A light blue Ford Tempo drove up beside them. The occupants laughed
and stared at D.H. When R.V. sped away, the blue car chased them. 
Its right headlight was dimmer than the left one, and pointed
downward. He heard gunshots, and the Camaro crashed into a ditch. 
R.V. got out of the car with his hands up. The driver was thin, had his
hair parted on the side, and was wearing a plaid "farm shirt" with
jeans. The driver of the blue car got out of the car, began cursing, and
yelled at R.V. in Spanish, "go over there." R.V. identified appellant as
the driver. Then the front seat passenger got out of the car. He was a
fat man wearing a light blue bandana mask and had a gun. He told R.V.
to get down and to "shut up or I'll kill you." The fat man took his watch
and wallet and began beating him with the gun and kicking him in the
back. The gun was a .357 revolver with a plastic grip. R.V. looked back
toward the Camaro and saw appellant hitting the window next to
where D.H. sat. Appellant had a shiny stainless steel revolver. 
Appellant yelled at D.H. to open the door, then he yelled at R.V. that he
would kill D.H. if she did not open the door. R.V. yelled at D.H. to open
the door. Appellant yelled that he wanted the radio and drugs. R.V.
replied he did not have any drugs. There was another man banging on
the driver's side of the Camaro. R.V. saw appellant pull D.H. out of the
Camaro.

 While this was happening, the fat man was still beating R.V. Then
he shot at R.V., who felt the heat of the bullet next to his head; it grazed
his hair. While he lay there dazed, the men left. R.V. then realized D.H.
was not in the Camaro. He began screaming for help. He had to try
several houses before anyone would help him. It took about thirty
minutes for the police to arrive. He eventually heard, over the police
radio, that D.H. was alive and at the hospital. He was taken to the
Sheriff's Department, where he gave a statement. R.V. saw appellant
in a live lineup and was initially "ninety percent" sure he was the driver,
but was not one hundred percent sure. However, he did positively
identify the light blue car. R.V. was devastated and could not think
straight at the time. Later that day, after he had thought about it, he
called investigator Fidel Perez and told him that he was one hundred
percent certain appellant was the driver. R.V. identified appellant in a
photo array (State's Exhibit No. 60). He also identified the other three
men in photo arrays (State's Exhibit No. 58, 59 and 61).

3. Norberto Leal, III


 Hidalgo County Sheriff's Deputy Norberto Leal, III, testified that at
approximately 6:00 a.m. on April 13, 1997, he received a report of a
possible automobile accident in the Granjeno -- Madero area of Hidalgo
County. When he arrived, he saw a black Camaro in a ditch. Its door
was open and there was damage to the mirror and the driver's side. 
Leal's sergeant arrived, and as they examined the car, R.V. appeared,
crying and yelling that his girlfriend had been taken at gunpoint by
some men in a light blue Ford Taurus or Tempo. R.V. had been robbed
and shot at by the men. Leal did not recover any bullet fragments at the
scene. He saw tire tracks at the scene, but did not preserve them. R.V.
described "Suspect Number One" as a Hispanic male, twenty-five to
thirty years old, five feet, seven inches tall, 220 to 240 pounds with
black short hair, heavy, stocky build and medium to brown complexion. 
He described "Suspect Number Two" as twenty-two to twenty-eight
years old, about five feet, seven inches tall, weighing about 140 pounds
with hair parted on the side, a thin build and a dark complexion. Leal
later located a vehicle matching R.V.'s description of the light blue car
at the El Rancho Apartments on Farm-to-Market Road 1016 in Madero.

4. Fidel Perez


 Fidel Perez, an investigator with the Hidalgo County Sheriff's
Office, interviewed appellant on April 16, 1997, after he had been
arrested in connection with this crime. Appellant's statement gave a
very detailed explanation of his whereabouts on April 13. Appellant
admitted he had possession of his father's light blue Ford Tempo on
April 13, but claimed he had loaned it to Oscar and Felipe Alaniz, who
needed it to "cross over some illegals." He described Oscar as about
twenty-one years old, five feet, eight inches tall, weighing 140 pounds,
with collar-length wavy black hair, dark eyes, dark complexion and a
mustache. He described Felipe as about nineteen years old, five feet,
seven inches tall, weighing 170 pounds ("a little chubby"), medium
complexion, with straight black hair below his collar, and a goatee. 
Appellant said the Alaniz brothers had dropped him off at a motel,
where he met a barmaid named Dora. He denied participating in any
crime. When the Alaniz brothers returned the car, they told him they
had done a "jale,"(2) and gave him forty dollars. He drove them to
Hidalgo, and they crossed the bridge into Mexico.

 After appellant's explanation of his activities on April 13 did not
check out, Perez interviewed appellant the next day, April 17, 1997. 
Appellant then stated he wanted to tell the truth "because I feel sorry
for what I did. I was drunk when all this happened." Appellant gave
a statement that in the early morning hours of April 13, 1997, he was
riding around in the light blue Ford Tempo with Oscar and Felipe and
two other men. Appellant was driving, Oscar was in the front
passenger seat, Felipe was sitting behind Oscar with appellant's two-year-old daughter Cinthia on his lap, and the other two men were also
in the back seat. Appellant's wife made him take Cinthia along because
she thought that might prevent him from going to a bar. His statement
recites the same facts related by the two victims, except that appellant
names Oscar as the man who pulled the female victim out of the car
and abducted her. Appellant says he told Oscar not to take the girl, but
Oscar just cursed at him. He names Felipe as the one who assaulted
the male victim. Oscar and Felipe were wearing masks. He also says
that Oscar was the one who took the female victim out of the car at the
second location and went off with her.

I knew that Oscar was going to rape her. . . . Felipe and one
of the other little guys walked to where Oscar was at.


He claims that he just sat in the car holding his daughter. Oscar later
gave him forty dollars. Oscar and Felipe went back to Mexico. Both of
appellant's statements were admitted into evidence.

 Perez was present during the live lineup. D.H. said, "I'm pretty
sure it's him but I can't tell you 100 percent that it's him." They
switched the men in the lineup around before letting R.V. see them. 
R.V. was also not positive at the lineup, but he later called Perez and
said that he was sure appellant was the one. Perez worked with
Mexican police authorities to locate a Felipe Alaniz and Oscar Alaniz in
Mexico, but was not successful. Perez opined he was not able to find
the Alaniz brothers because no such people exist.

5. John Ortega


 John Ortega, an investigator with the Hidalgo County Sheriff's
Office, began trying to locate the light blue Ford Tempo. He received
Leal's information about a light blue Tempo seen in Madero. The
Tempo was parked in front of appellant's home. He also located the
scene of the sexual assault and recovered a pair of pink panties and a
sanitary napkin. He found the scene by looking for the large white box
D.H. described. There was an abandoned refrigerator nearby. He spoke
with the barmaid Dora, who denied being with appellant on April 13. 
He also found no corroborating records at the motel at which appellant
claimed he and Dora stayed.

 Ortega testified appellant has used numerous aliases. Ortega
developed other information he received about the crime. He identified
State's Exhibit No. 59 as a photograph of Ricardo "Ricky" Acedo
Camacho (identified by both victims as the heavy man who assaulted
R.V.); State's Exhibit No. 61 as a photograph of Juan Esquivel
Castaneda, appellant's brother (identified by D.H. as the man who drove
the Ford Tempo to the location of her sexual assault); and State's
Exhibit No. 58 as a photograph of Javier Esquivel Pena, appellant's first
cousin (identified by D.H. as the man holding the child).

6. Joel Castro


 Joel Castro, an identification technician with the Hidalgo County
Sheriff's Office, processed the 1989 Light Blue four-door Ford Tempo on
April 16, 1997. He recovered no usable fingerprints. The exterior of the
car and its tires were muddy. Inside the car, he found an unspent .45
caliber "Federal" brand bullet on the front passenger seat. There was 
an unused disposable diaper on the front center console, a stuffed toy
hanging from the rearview mirror, and a license plate and some empty
beer bottles on the rear floorboard. The headlight on the passenger's
side was dimmer than the one on the driver's side.

7. Alejandro Madrigal, Jr.


 Alejandro Madrigal, Jr., an employee of the Texas Department of
Public Safety Crime Laboratory, testified concerning the testing of DNA
found on the victim's body and clothing. Swabs were taken of D.H.'s
vagina, rectum and mouth. Sperm were identified on the vaginal and
rectal swabs. DNA from this sperm is consistent with R.V., not
appellant. A spermatozoa was also present in the oral swab, but was
an insufficient quantity to be tested. DNA obtained from the victim's
jeans was also consistent with R.V., not appellant. However,
appellant's DNA could not be excluded from the sperm found on the
chest area of D.H.'s blouse.


8. Auscencia Botello


 Auscencia Botello, a nurse at Mission Hospital, testified she
collected part of D.H.'s "rape kit" at the hospital. There are many
circumstances that may result in little or no sperm being found in or on
a sexual assault victim's body, such as running or walking, urinating
before the evidence is collected, menstruation, and drinking. Also, the
perpetrator may be infertile, may have a lowered sperm count because
he was using alcohol, or may not have ejaculated. D.H. was
menstruating at the time of this incident, and urinated before the "rape
kit" evidence was collected.

 After reviewing all the evidence in the record, we cannot say that
the verdict is so against the great weight of the evidence presented at
trial that it is manifestly unjust and clearly wrong. See Clewis, 922
S.W.2d at 133-34. It is true that mere presence at a crime scene is not
enough to support a conviction. Ransom v. State, 920 S.W.2d 288, 303
(Tex. Crim. App.). However, we find substantial evidence supporting
appellant's participation in each of the four offenses for which he is
convicted. D.H. and R.V. identified appellant as one of the men who
robbed them, and both identified appellant as the man who pulled D.H.
from R.V.'s Camaro. D.H. identified appellant as the man who abducted
her, and the man who initially raped her. Both victims described and
identified the light blue Ford Tempo that appellant admitted he was
driving the night of the offenses, and which was found parked in front
of his home. Both victims picked appellant's photograph out of a photo
array. They also picked out photographs of his accomplices, including
appellant's brother and first cousin. In appellant's first statement to the
police, he lied about his whereabouts that night. In his second
statement, appellant placed himself and his young daughter at the
scene of the crime, and admitted he had proceeds from the robbery.
Several law enforcement officers testified about their investigation of
these crimes, and how the results led them to arrest appellant. The
emergency room nurse who treated D.H. testified as to why appellant's
sperm might have been absent or found in small quantities on D.H.'s
body. Appellant's reliance on the fact that DNA evidence recovered did
not absolutely prove his participation in the sexual assault is misplaced. 
Appellant could not be excluded as the donor of the semen found on the
chest area of D.H.'s blouse.

 While appellant's statements to the police may tend to support his
claim of innocence, under a factual sufficiency review, the trier of fact
is recognized as the sole judge of the credibility of the witnesses and
the weight to be given their testimony. Sharp v. State, 707 S.W.2d
611, 614 (Tex. Crim. App. 1986). The jury may resolve or reconcile
conflicts in the testimony as it sees fit. Tex. Code Crim. Proc. Ann. art.
38.04 (Vernon 1979); Clewis, 922 S.W.2d at 133; Haskins v. State, 960
S.W.2d 207, 209 (Tex. App.--Corpus Christi 1997, no pet.). In our
review, we must be careful not to intrude on the jury's role. Santellan,
939 S.W.2d at 164. In assessing factual sufficiency, we do not decide
the existence or nonexistence of a vital fact, decide the truth or falsity
of proffered evidence, or judge the credibility of witnesses. Scott v.
State, 934 S.W.2d 396, 399 (Tex. App.--Dallas 1996, no pet.). If
reasonable minds could differ about the conclusions to be drawn from
the evidence, we may not reverse for factually insufficient evidence. Id. 
In other words, we do not sit as the thirteenth juror. Moreno v. State,
755 S.W.2d 866, 867 (Tex. Crim. App. 1988). Using these standards,
we conclude the jury was within its power to reject in whole or in part
any evidence tending to show appellant did not commit these crimes,
and to believe the eyewitness accounts and other evidence indicative
of appellant's guilt. We hold the evidence is factually sufficient to
support appellant's convictions. Appellant's first point of error is
overruled.

 By his second point of error, appellant complains the trial court
erred in allowing nurse Auscencia Botello to testify about the contents
of State's Exhibit No. 62, the victim's medical records from her
treatment at Mission Hospital after the assault.

 Before the jury was brought in, the attorneys had a conference
with the judge about the records. Appellant's counsel argued that if the
court allowed the nurse to testify about the doctor's statements
contained in the medical records:

Number one, it's going to be hearsay; and, number two,
we'd like to be able to confront the doctor to appropriately
cross-examine him. Number three, they'll be bolstering for
the doctor's report, bolstering in the sense that he's not here
now.


These objections were overruled, and the medical records were
admitted into evidence as a business record accompanied by an
affidavit. See Tex. R. Evid. 902(10)(a). On appeal, appellant contends
the trial court erred "in allowing a records custodian to testify as to the
subject matter and content of the medical report." He further claims
that by allowing the testimony, the trial court violated his constitutional
right to confront and examine the attending physician who prepared the
report. 

 Nurse Botello testified that she collected "rape kit" evidence from
D.H. in the emergency room at Mission Hospital. She further testified
that Dr. Ivan Melendez collected the vaginal and rectal swabs from D.H. 
She read the part of the report prepared by Dr. Melendez, including the
patient's history, which included a graphic account of what happened
to D.H. and R.V., and the results of the doctor's examination of D.H.

 Texas Rule of Evidence 902(10)(a) provides that records otherwise
admissible under rule 803(6) or (7) may be authenticated without the
live testimony of the custodian of such records if they are accompanied
by an affidavit of the custodian. Rule 803(6) provides an exception to
the hearsay rule for

[a] memorandum, report, record, or data compilation, in any
form, of acts, events, conditions, opinions, or diagnoses,
made at or near the time by, or from information transmitted
by, a person with knowledge, if kept in the course of a
regularly conducted business activity, if it was the practice
of that business activity to make the memorandum, report,
record, or data compilation . . . unless the source of
information or the method or circumstances of preparation
indicate lack of trustworthiness.


Tex. R. Evid. 803(6). A sexual assault victim's emergency room medical
records are admissible under rule 803(6) as an exception to the hearsay
rule. See Taylor v. State, 755 S.W.2d 548, 554 (Tex. App. Houston [1st
Dist.] 1988, pet. ref'd). Furthermore, if appellant wanted to cross-examine Dr. Melendez, he could have served the doctor with a
subpoena and required him to be present at trial. Nurse Botello merely
recited on the stand what the jury was free to read for itself, as the
medical records had already been properly admitted into evidence. We
hold there was no abuse of discretion in the admission of these records,
or in the nurse's testimony regarding them. Appellant's second point
of error is overruled.

 By his third point of error, appellant complains the trial court erred
in not including the "law of parties" instruction on all four counts of the
jury charge. In the indictment, appellant was charged with the
following counts:

 (1) Count one -- aggravated robbery of D.H.;

 (2) Count two -- aggravated robbery of R.V.;

 (3) Count three -- aggravated kidnaping of D.H.; and

 (4) Count four -- aggravated sexual assault of D.H.


The jury was charged that it could find appellant guilty of counts one
and four only as a primary actor. However, it could find appellant guilty
of counts two and three either as a primary actor or as a party. At trial,
appellant objected to the omission of party responsibility language in
counts one and four, but the trial court overruled his objection. 
Appellant now contends the trial court erred by omitting the party
responsibility language in counts one and four.

 The function of the jury charge is to instruct the jury on the law
applicable to the case. Dinkins v. State, 894 S.W.2d 330, 338 (Tex.
Crim. App. 1995); Caldwell v. State, 971 S.W.2d 663, 666 (Tex.
App.--Dallas 1998, pet. ref'd). It is well settled that analysis of jury
charge error depends largely on whether the appellant objected to the
complained-of language or omissions at trial:

If the error in the charge was the subject of a timely
objection in the trial court, then reversal is required if the
error is "calculated to injure the rights of defendant," which
means no more than that there must be some harm to the
accused from the error. In other words, an error which has
been properly preserved by objection will call for reversal as
long as the error is not harmless.


 On the other hand, if no proper objection was made at
trial and the accused must claim that the error was
"fundamental," he will obtain a reversal only if the error is so
egregious and created such harm that he "has not had a fair
and impartial trial" -- in short "egregious harm."

 

Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); see
also Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 1981). When we
review alleged charge error, we determine: (1) whether error actually
exists in the charge; and (2) whether any resulting harm requires
reversal. Mann v. State, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998);
Duke v. State, 950 S.W.2d 424, 426 (Tex. App.--Houston [1st Dist.]
1997, pet. ref'd) (citing Almanza, 686 S.W.2d at 171). Under the
Almanza rule, if appellant can show that the omission to which he
timely objected at trial was erroneous, he is entitled to a reversal only
if the error was harmful.

 We first determine whether there is any error in the charge. A
person is criminally responsible as a party to an offense if the offense
is committed by his own conduct, by the conduct of another for which
he is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a)
(Vernon 1994); Goff v. State, 931 S.W.2d 537, 544 (Tex. Crim. App.
1996). A jury charge on the law of parties is appropriate when the
evidence indicates a defendant encouraged, directed, or aided another
in the commission of the offense. Crank v. State, 761 S.W.2d 328, 352
(Tex. Crim. App. 1988); Bryant v. State, 982 S.W.2d 46, 49 (Tex.
App.--Houston [1st Dist.] 1998, pet. ref'd). To support conviction as
a party, the evidence must show that the parties acted together at the
time of the offense, each contributing to the execution of the offense. 
Becker v. State, 840 S.W.2d 743, 746 (Tex. App.--Houston [1st Dist.]
1992, no pet.). In determining whether a defendant acted as a party,
the trial court may examine events occurring before, during, and after
the commission of the offense. Ransom v. State, 920 S.W.2d at 302.

 It is true that appellant could also have been charged as a party to
the aggravated robbery and aggravated sexual assault of D.H. 
However, after reviewing the record, we hold the evidence is sufficient
to support appellant's conviction as a primary actor in the aggravated
robbery of D.H. (count one) and the aggravated sexual assault of D.H.
(count four), thus the error in the charge, if any, was harmless.

 Furthermore, we note the State argued during closing argument
that appellant was guilty as the primary actor in counts one and four. 
See Teague v. State, 864 S.W.2d 505, 517-18 (Tex. Crim. App. 1993),
overruled on other grounds by Robertson v. State, 871 S.W.2d 701, 712
(Tex. Crim. App. 1993) (where appellant's guilt as the primary actor
was the theory best supported by the overwhelming evidence and most
fervently advanced by the State in closing arguments, any error in
refusing appellant's requested law of parties charge, and in failing
properly to apply the law of parties was harmless). Even if the trial
court's denial of appellant's request to include the law of parties in
counts one and four was erroneous, we conclude it did not harm
appellant. Appellant's third point of error is overruled.

 By his fourth point of error, appellant complains he was harmed
by the unavailability of the report of the State's DNA expert, which the
jury requested during its deliberations. Appellant asserts the report of
Alex Madrigal, the State's witness who testified about the results of the
DNA testing performed on the semen found on D.H.'s body and
clothing, was requested by the jury during its deliberation on
guilt/innocence, but the report could not be found. Appellant contends
he was harmed by the trial court's failure to respond to the jury's
request, and that he is entitled to a reversal. 

 To preserve error for appellate review, the defendant must make
a timely request, objection or motion that states the grounds for the
action sought with sufficient specificity to make the trial court aware of
the complaint, and must obtain a ruling on the request, objection or
motion. Tex. R. App. P. 33.1; Taylor v. State, 939 S.W.2d 148, 155 (Tex.
Crim. App. 1996). No such objection to the court's alleged failure to
provide the requested report was ever made. Thus, we conclude
appellant has not preserved this issue for our review. 

 Furthermore, we cannot ascertain from the record that the report
was not provided, if requested. The clerk's record reflects only that the
jury sent out a note stating, "We would like to see the reports,
statements, and affidavits that were admitted into evidence." However,
we find no evidence in the record that the DNA expert witness's report
was not provided.

 We hold appellant has failed to preserve this issue for appellate
review. Appellant's fourth point of error is overruled.

 By his fifth point of error, appellant contends the trial court erred
in proceeding with the punishment phase of the trial with only eleven
jurors. 

 After the jury returned a verdict of guilty on July 16, 1998, the
punishment phase began that afternoon, and deliberations began the
next morning. According to Deputy Lyle Skaggs, during the lunch break
on the first day of deliberations, juror Rosita De la Rosa Morales began
to cry and told him:

I thought I was strong enough but I'm not. I can't do this. 
I want to go home. I want to leave.


He asked her if someone had intimidated her, and she replied "no." He
then told her she would have to talk to the judge. She sat apart from
the other jurors at lunch and wept. She would not look at the other
jurors, and would not eat or drink anything. Rosita De la Rosa Morales
testified:

I thought I was strong enough to send somebody to prison
but I can't. I can't. I can't live with myself.


The juror stated that no one from outside the courthouse had talked to
her that morning. She asked to be excused. Deputy Skaggs and
Deputy Ross Beltran both testified that Mrs. Morales had never
approached them about having any problem with serving on the jury
prior to the lunch break of July 17. 

 Appellant's counsel informed the trial court that he did not agree
to go forward on punishment with only eleven jurors, and requested a
mistrial. He argued: "in reference to [code of criminal procedure article]
36.22 I don't believe it's clear as to the punishment phase and that's a
problem that I have with it." The judge dismissed Rosita De la Rosa
Morales from the jury panel, finding she was "enough distraught and
emotionally disturbed at this point where she is disabled," and denied
appellant's motion for mistrial. The remaining eleven jurors assessed
appellant's punishment at 99 years imprisonment and a $10,000 fine
for each of the four counts. Appellant contends the trial court erred in
denying his motion for mistrial.

 Article 36.29(c), which became effective on September 1, 1997,
states:

(c) After the charge of the court is read to the jury, if any one
of them becomes so sick as to prevent the continuance of his
duty, or any accident of circumstance occurs to prevent their
being kept together under circumstances under which the
law or the instructions of the court requires that they be kept
together, the jury shall be discharged, except that on
agreement on the record by the defendant, the defendant's
counsel, and the attorney representing the state 11 members
of a jury may render a verdict and, if punishment is to be
assessed by the jury, assess punishment. If a verdict is
rendered by less than the whole number of the jury, each
member of the jury shall sign the verdict.


Tex. Crim. Proc. Code Ann. art. 36.29(c) (Vernon Supp. 2000) (emphasis
added). Article 36.29(c) clearly requires a defendant's agreement to
proceed to verdict with eleven jurors if one juror is disabled "after the
charge of the court is read to the jury."

 The State concedes the trial court erred in denying appellant's
motion for mistrial, but it argues that we must reverse on punishment
alone. Appellant contends we must reverse the entire conviction. He
argues that if the trial court had properly granted his motion for new
trial when it was urged, he would have received a new trial on
guilt/innocence. See State v. Hight, 879 S.W.2d 845, 847 (Tex. Crim.
App. 1995) (a trial court does not have the power to grant a new trial
on punishment alone) However, that is not the standard of review we
must apply.

 Rule 44.2(a) provides that:

[i]f the appellate record in a criminal case reveals
constitutional error that is subject to harmless error review,
the court of appeals must reverse a judgment of conviction
or punishment unless the court determines beyond a
reasonable doubt that the error did not contribute to the
conviction or punishment.


Tex. R. App. P. 44.2(a). The right to have a twelve-member jury is
constitutional in nature, although it is also a statutory right in Texas. 
Tex. Code Crim. Proc. Ann. art. 36.29 (Vernon Supp. 2000); Rivera v.
State, 12 S.W.3d 572, 579 (Tex. App.--San Antonio 2000, no pet.). 
Article 44.29 of the code of criminal procedure further provides:

If the court of appeals or the Court of Criminal Appeals
awards a new trial to a defendant other than a defendant
convicted of an offense under Section 19.03, Penal Code,(3)
only on the basis of an error or errors made in the
punishment stage of the trial, the cause shall stand as it
would have stood in case the new trial had been granted by
the court below, except that the court shall commence the
new trial as if a finding of guilt had been returned and
proceed to the punishment state of the trial . . .


Tex. Code Crim. Proc. Ann. art. 44.29 (Vernon Supp. 2000); Rent v.
State, 982 S.W.2d 382, 385-86 (Tex. Crim. App. 1998).

 The facts of Rivera are very similar to those of the instant case. 
Rivera was on trial for murder, and the jury returned a verdict of guilty. 
Rivera, 12 S.W.3d at 574. Some of the defendant's family went to one
juror's house to talk with him about the case. Id. at 578. The juror
testified that he felt uncomfortable because he was going to have to tell
the family members the verdict, but that he did not feel under pressure. 
Id. The trial court excused the juror, and proceeded to punishment with
only eleven jurors, over Rivera's objection. Id. The eleven-member jury
sentenced Rivera to life imprisonment. Id. The San Antonio Court of
Appeals held the trial court erred by excusing the juror, and by
proceeding to punishment with eleven jurors over Rivera's objection. 
Id. The right to a twelve-member jury is constitutional in nature and,
thus, subject to harmless error analysis. Id. By proceeding to
punishment with only eleven jurors, the State's burden was lessened,
and because the jury assessed the maximum punishment against
Rivera, the court of appeals could not conclude beyond a reasonable
doubt that the decision to excuse the juror did not contribute to the
assessment of the maximum punishment. The court then ordered a
new trial as to punishment only. Id. at 579-80. We find this reasoning
persuasive.

 We hold the trial court erred in denying appellant's motion for
mistrial. Because the jury assessed a punishment of 99 years
imprisonment and a $10,000 fine for each of the four counts, we cannot
conclude beyond a reasonable doubt that the trial court's decision to
excuse the juror did not contribute to the assessment of this
punishment. We overrule that part of appellant's fifth point of error
requesting a new trial on guilt/innocence. We sustain that part of
appellant's fifth point of error requesting a new trial on punishment. 

 The judgment of the trial court finding appellant guilty of the four
counts alleged in the indictment is affirmed. The judgment of the trial
court assessing punishment for each of those four counts is reversed,
and the cause is remanded to the trial court for a new trial on
punishment only.



 FEDERICO G. HINOJOSA

 Justice



Publish. Tex. R. App. P. 47.3.


Opinion delivered and filed this

the 17th day of August, 2000.

1. Appellant is also known as Mario Castaneda.
2. Spanish slang for a "job."
3. Tex. Pen. Code §19.03 defines the offense of capital murder.